UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JASON E. PALM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 07-102-P-H |
| | ) | |
| STATE OF MAINE, et al., | ) | |
| | ) | |
| Defendants | ) | |

***Recommended Decision on State Defendants' Motion to Dismiss (Docket No. 22)***

Jason Palm has filed a civil action against fourteen defendants with allegations that stem from a July 23, 2005, incident at his Fayette, Maine residence that transpired after Palm called 911 seeking medical assistance for his mother-in-law.  A chain of events ensued in which Palm's wife, Charlotte Palm, was alone with animals inside the residence and state and county law enforcement officers were outside the residence on a theory that Charlotte was armed and suicidal and were attempting to get Charlotte to emerge.  In his second amended complaint – which is 151-pages long, and contains 436-paragraphs -- Palm lists nineteen causes of action, some federal, some state, and some a hybrid of the two.

In this recommended decision I address a motion filed by a group of defendants to whom I refer as the State Defendants.  (Docket No. 22)   I recommend that the Court grant the motion for the reasons that follow.

*Discussion*

I address the State Defendants' motion to dismiss through the prism of <u>Bell Atlantic Corp. v. Twombly</u>, __U.S. __, 127 S. Ct. 1955 (May 21, 2007). Under <u>Twombly</u> Palm's complaint must demonstrate "a plausible entitlement to relief." 127 S.Ct. at 1967. <u>See</u> <u>also</u> <u>Erickson v. Pardus</u>, __U.S. __, 127 S.Ct. 2197, 2200 (June 4, 2007); <u>Alvarado Aguilera v. Negron</u>, __ F.3d __, __, 2007 WL 4247665, *1 (1st Cir. Dec. 5, 2007); <u>Rodriguez-Ortiz v. Margo Caribe, Inc.</u>, 490 F.3d 92, 95-96 (1st Cir.2007).  I "assume the truth of all well-plead facts and give the plaintiff the benefit of all reasonable inferences therefrom." <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir.2007). This task is not an easy one in that Palm's second amended case is a case-study in circumlocution. <u>See</u> <u>Brown v. Latin American Music Co., Inc.</u>, 498 F.3d 18, 25 (1st Cir. 2007); <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996).

Palm's second amended complaint contains nineteen discreet causes of action and as to each of these "dismissal for failure to state a claim will be appropriate if the pleadings fail to set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" <u>Centro Medico del Turabo, Inc. v. Feliciano de Melecio</u>, 406 F.3d 1, 6 (1st Cir. 2005) (quoting <u>Berner v. Delahanty</u>, 129 F.3d 20, 25 (1st Cir.1997) in turn quoting <u>Gooley v. Mobil Oil Corp.</u>, 851 F.2d 513, 515 (1st Cir.1988)).  "Under this rubric, it is sometimes permissible to grant a motion to dismiss based on an affirmative defense…," <u>id.</u>; these defendants press two affirmative defenses, sovereign immunity and absolute immunity.

2

***The State of Maine, the Maine State Police, Attorney General Steven Rowe, and
Former Chief of the Maine State Police Craig Poulin***

With respect to the group of State Defendants, Palm has named the State of
Maine, the Maine State Police, Attorney General Steven Rowe, and Former Chief of the
Maine State Police Craig Poulin as defendants.   The State of Maine cannot be sued in
this Court because it is cloaked by sovereign immunity, immunity that extends to the
Maine State Police as a state agency.  See Alabama v. Pugh, 438 U.S. 781, 782 (1978);
see also Will v. Michigan Dept. State Police, 491 U.S. 58, 66 (1989) ("The Eleventh
Amendment bars such suits unless the State has waived its immunity, Welch v. Texas
Dept. of Highways and Public Transportation, 483 U.S. 468, 472-473 (1987) (plurality
opinion), or unless Congress has exercised its undoubted power under § 5 of the
Fourteenth Amendment to override that immunity.").

With regards to Rowe and Poulin there is not a single allegation in Palm's very
detailed complaint that supports a conclusion that either Rowe or Poulin had any personal
involvement in the events and claims for damages against state officers in their official
capacity are barred by the Eleventh Amendment.[1]  See id. at 71. ("[A] suit against a state
official in his or her official capacity is not a suit against the official but rather is a suit
against the official's office. As such, it is no different from a suit against the State
itself."); see also Kentucky v. Graham, 473 U.S. 159, 165-67 & n.14 (1985).

---

[1]      Apropos Rowe, Palm's only specific mention of him is that Palm's efforts to resolve the matter
"through various individuals and governmental offices within the State of Maine including but not limited
to Maine's Attorney General G. Steven Rowe have gone unanswered or addressed for a period of (1) one
year and (11 3/4) eleven and three quarter months."  (Id. ¶ 326.)  This does not state an actionable legal
claim against Rowe in his individual capacity.
         With regards to Poulin, despite not mentioning Poulin in his factual allegations, Palm may be
trying to hold him responsible on a theory of supervisory liability (see id. ¶¶ 399-404), as well as in his
official capacity,  however any such claim fails on the factual allegations of the detailed second amended
complaint for the same reasons that the supervisory claims fail against Defendants Snedeker and Kelly, as
discussed immediately below.

3

### *Lieutenant William Snedeker and Adam Kelley*

Palm identifies Lieutenant William Snedeker as the supervisor of the Special Units Department of the Maine State Police.  He identifies Adam Kelley as the supervisor of the Crisis Negotiation Team of the Maine State Police.   Nowhere in his complaint does Palm allege that either one of these individuals had any personal involvement in the events of July 23, 2003.  Palm's theory vis-à-vis their liability seems to be that they are responsible, off-the-scene supervisors of the Maine State Police employees who responded to the residence on the day in question.

In his second amended complaint Palm has put all his cards on the table and with regard to the involvement of the Maine State Police the complaint has identified one individual employed by that state agency involved in the July 23, 2005, response to his residence.   This individual is a bullhorn-wielding negotiator – not sued by Palm, by name or as a Doe defendant -- who allegedly tried to communicate with Palm's wife, telling her that they had a warrant for her arrest (which Palm believes they did not actually have at the time) and directing her to  come out of the home with her hands up. (2d Am. Compl. ¶¶  55, 56, 57, 59, 70, 72, 75, 91.)    Palm describes how the negotiator asked his wife to present herself at the glass door or a window so that he could see her and verify that she was okay.  (Id. ¶ 76.)  Palm's wife responded by throwing a dog ball out the door, an action the negotiator saw.  (Id.)  Still, the negotiator continued to insist that she go to the door or a window for a while.  (Id.)  Palm faults all the responders, including the negotiator, for not actually attempting to go to the door or one of the windows to speak to his wife like any civilized person would do.  (Id. ¶¶ 78, 215.)  Palm further faults the negotiator for the following conduct:

87.    About 5 o'clock Plaintiff's wife was sure the road had been blocked and the Plaintiff and Louise were not being allowed to return home.  Plaintiff's wife was completely shocked when the Maine State Police negotiator finally shouted from his hiding station and thru his bull horn, "Charlotte, I guess I better tell you your husband and mother ….., her … your mother has made a request or two (he began to laugh) to talk to you but I'm not going to let her do that because I don't want to add KIDNAPPING to the list of charges I have against you".  The negotiator slyly changed his previous statement from "your husband and mother" to "your mother" has made a request to talk to you,  Plaintiff's wife caught that and realized they were trying to make her believe her husband was still mad and betraying her.  Plaintiff's wife knew better than that because she knew her husband all to well.  The police negotiator is saying all this while pretending to be worried about Plaintiff's wife committing suicide. (?)

88.    By this time and with that said, Plaintiff's wife could only smile and laugh and nod her head in disbelief of exactly what the Maine State Police's negotiator was trying to pull.   However, she quickly realized with that level of stupidity often comes great danger especially given the fact he works for the Maine State Police. ….

(Id. ¶¶ 87, 88.)

With regards to Palm's allegations concerning the firing of shots into his home, there is no fair inference that this bullhorn wielding negotiator took any part in this.  Palm alleges that as the sun went down, "Defendants WITHOUT ANY PROVOCATIONS OR WARNING opened fire on the house all at once as Plaintiff's wife and the dogs were lying down on the floor in the upstairs bedroom crying."  (Id. ¶ 102.)  "Plaintiff's wife quickly thought to test the policemen right back by firing one round from her hand gun upwards towards the roof where she was quite sure no policemen were sitting because of the dangerously steep pitch…."  (Id.)  Ten to fifteen minutes later, again without provocation, "the policeman" opened fire a second time.  (Id. ¶ 105.)  Palm also writes of "at least one policem[a]n hiding on the far side of the Plaintiff's house"  who fired four live rounds directly toward the bedroom in which Palm's wife and dogs were." (Id. ¶ 107.)

As for the negotiator, Palm alleges that he was "hiding like a coward behind a tree or rock," prompting his wife to "verbally tear them a new 'eardrum" in which she announced she had just tested them too and she delivered their grade of 'F' back through their senses…"  (Id. ¶ 110.)  On hearing these sentiments, the negotiator allegedly shouted back: "'What's the matter Charlotte, don't you want me."  (Id.)  He then resumed telling her they had a warrant for her arrest and directing her to come out with her hands up.  (Id. ¶ 113.)   Palm asserts that his wife decided to confront the negotiator and "walked right out the main door and down the steps and continued to tell the negotiator off."  (Id. ¶ 116.)  Confronted by her continued questioning:

> The negotiator finally  said "We were told by someone that you threatened another person with a gun".  Plaintiff's wife immediately told the negotiator he was ABSOLUTELY WRONG and that was ABSOLUTELY NOT TRUE and she insisted the negotiator tell her who had made the claim and who she supposedly threatened.  The negotiator asked again, "you mean you never threatened to shoot someone with a gun[?]" Again the Plaintiff's wife immediately told the negotiator that she "ABSOLUTELY HAD NOT THREATENED TO SHOOT SOMONE WITH A GUN" and that was ABSOLUTELY NOT TRUE and she didn't believe him.  The negotiator absolutely refused to give either name to the Plaintiff's wife and since he proved again that he was intent on playing games, she turned and walked back up the patio steps and right back into the house.

(Id.)

In short course Charlotte Palm decided to gather her dogs and leave the house. (Id. ¶ 118.)  She shouted to the negotiator to "come out from behind his rock" only to be told by County Sheriff Deputy Wrigley that the negotiator had "tucked tail and run". (Id.)  As she was being frisked, a couple of other policemen came around the house from the vicinity of where the four shots were fired into the area of the house she had been in. (Id. ¶ 120.)  One of these two policemen walked up to her and "held his rifle straight at Plaintiff's [wife's] head while violently screaming in an outrageous and sick way, "get

your hands up in the air, and get down on the ground." (Id.) Other officers present

attempted to quell this conduct. (Id.) This man insisted she get down and then he frisked

her again. (Id.) Charlotte was having difficulty breathing and this man told her that it

"was just too bad" and indicated that he thought she was faking. (Id. ¶ 121.)

"Unfortunately," Palm laments, "Plaintiff's wife was too busy trying to get her breath

back and stop coughing to get a look at the psychotic man." (Id.) "However," he

continues, " there were enough witnessing policem[e]n around who should be more than

willing to tell the truth under oath and identify him and thus we will have the person who

most likely committed the crime of 'attempted murder' with the live rounds against the

Plaintiff's wife in just a few minutes prior." (Id.) I take this allegation to mean that Palm

believes that the individual who fired the four rounds into the house was the same

individual who confronted Charlotte with such flagrant aggression (as described by Palm)

after she emerged from the home.   Further on in his complaint allegations, Palm suggests

that this individual was: "Most likely State police." (Id. ¶ 231.) He claims that his real

property sustained damage "caused entirely by Defendant's of the Maine State Police and

Kennebec County Sheriff's Office"; damage that was not covered by the written consent

that Palm executed because, in Palm's view, the extent of the damage was unnecessary.

(Id. ¶ 332.)

        In his second amended complaint Palm also indicates that on July 10, 2006, "the

Maine State Police" arrived at the Palms' home to arrest Charlotte Palm "using the

fraudulent warrant for the fraudulent charge of 'terrorizing' (Plaintiff) issued by the

Kennebec County District Attorney's office stemming back to the incident at their house

on July 23, 2005." (Id. ¶ 283.) Palm alleges that the Maine State Policeman who picked

up his wife explained that the Kennebec County Sheriff's Office requested that the Maine State Police pick Charlotte up because they were worried about possible rape charges stemming from the transportation of Charlotte between hospitals in July 2005.  (<u>Id.</u> ¶ 286.)  He faults this officer for failing to read Charlotte her <u>Miranda</u> rights.  (<u>Id.</u> ¶ 309.) Palm states that he attempted to follow the Maine State Police cruiser to the Kennebec County Sheriff's Office but the driver was driving too fast and Palm's nose was bleeding. (<u>Id.</u> ¶ 285.)  When Palm finally arrived as the sheriff's office after coping with his nose bleed the Maine State Police officer "seemed a little disturbed" and "quickly noticed" that Palm "was not looking very well at all" and asked Palm if he needed to get to a hospital. (<u>Id.</u> ¶¶ 287, 288.)

As for the claims of slander, Palm's second amended complaint alleges that Palm and his wife "had been told" that "the Kennebec County Sheriff's Office or the Maine State Police had reported false and 'slanderous' information regarding Plaintiff's wife to the local newspaper and because of that the newspaper unknowingly printed the same statements they received on the 'police log'."  (<u>Id.</u> ¶ 297.)   After library research, Palm concluded:  "The statements printed and caused to be printed by either the Kennebec County Sheriff's Office or the Maine State Police were indeed false and 'slanderous' and as a matter of fact just to point out how incredibl[y] inaccurate the reports w[]ere, in one of the reports, Plaintiff's wife was referred to as being a 'man.'"  (<u>Id.</u> ¶ 297.)

With respect to harm flowing to Palm, he faults the negotiator for not telling Palm's wife that Palm and her mother wanted to speak to her.  (<u>Id.</u> ¶ 72.)  He also alleges that after hearing this shooting while being forced to wait in the dark down the road his "entire body began to shake and his nose began to bleed."  (<u>Id.</u> ¶ 108.)  Palm also

complains that he and his mother-in-law went to two Maine State Police offices and requested a copy of the police report on the July 23, 2005, incident and were told that the Maine State Police did not issue a report for this case.  (Id. ¶¶  170, 171.)

The only other allegations tangentially relating to the Maine State Police that I could identify are as follows:  A witness was stopped by a person claiming to be with the Maine State Police (id. ¶ 45); Palm was told that the Maine State Police by a town official that it was "well known" that they had "earned a reputation for 'shooting first and asking questions later.'" (id. ¶ 59); the Maine State Police may have had German Shepherds with them and were trying to control them so they would not "blow their cover." (id. at ¶ 61); the Maine State Police were responsible for a number of the 50 vehicles lined up along Palm's road (id. ¶ 71); "an employee of the State of Maine," going by the name of Buddy, "on behalf of the State of Maine" made "malicious, threatening, and harassing phone calls" to the Palms relating to this event, and, although Palm knows this person's last name and where he works, he reserves the right to withhold this information until later ( id. ¶¶ 190, 191, 268); a Lieutenant James Luce of the Maine State Police Internal Affairs sent a letter to Palm's mother-in-law regarding the July 23, 2005, situation, informing her that the Maine State Police took the allegations of real or perceived misconduct very seriously (id. ¶ 267); and a lawyer told the Palms that "he thought it sounded like the Maine State Police used the Plaintiff's property as a 'tactical unit training exercise' because Plaintiff and Plaintiff's wife appeared to be vulnerable and naïve and easy for them to take advantage of." (id. ¶ 312).[2]

---

[2]    Palm also refers to a policeman on the scene who made remarks comparing Palm's smile to Charlotte's lack of a smile, suggesting that Palm's smile turned this officer on whereas Charlotte did not. (Id. ¶¶ 123, 135.)  This officer is not a named defendant and there is no indication that Palm has personal knowledge that he was from the Maine State Police.

It is evident from the allegations pertaining to the Maine State Police that I have culled above that Palm personally has no actionable claim based on the conduct of the negotiator whose interactions were targeted toward Charlotte. The only connection between Palm and the negotiator concerned whether or not the negotiator was willing to relay information to Charlotte, to wit, that Palm and her mother wished to talk to her about the situation. There is no allegation that Palm even personally communicated this request to the negotiator and even if he did this does not support an actionable state law or federal legal claim. As for the individual who emerged from behind the home and confronted Charlotte after she had surrendered, Palm cannot get redress for this conduct that was directed at Charlotte. As for Palm's wild speculation that there was an officer behind the house who fired shots into the upstairs bedroom, an officer that he speculates could have been from the Maine State Police, Palm would have a property interest threatened by this conduct. However, Palm does not know who this individual is and he has not named this individual as part of his suit. There is nothing in this very detailed complaint that would give these State Defendants any reasonable basis for attempting to defend claims based on Palm's accusations pertaining to this person. He is seeking to hold two individuals liable as supervisors of this unknown person, a far too tenuous hope in view of what he would need to demonstrate to establish the liability of Snedeker and Kelley. On this score I note that, with respect to Palm's federal constitutional claims, a "supervisory officer may be held liable for the behavior of his subordinate officers where his 'action or inaction [is] affirmative[ly] link[ed] ... to that behavior in the sense that it could be characterized as "supervisory encouragement, condonation or acquiescence" <u>or</u> "gross negligence amounting to deliberate indifference."'" <u>Wilson v. Town of Mendon,</u>

294 F.3d 1, 6 (1st Cir 2002) (quoting Lipsett v. University of P.R., 864 F.2d 881, 902 (1st Cir.1988)).  The "affirmative link" requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.  Hegarty v. Somerset County, 53 F.3d 1367, 1379 -80 (1st Cir. 1995).[3]

With regards to Palm's allegation of slander, the alleged slander concerns Charlotte Palm and not Jason Palm, and Palm has no standing to seek redress for these statements.

### The Kennebec County District Attorney's Office defendants: Evert Fowle, Brad Grant, Darrick Banda, and Patricia Kelley

In his second amended complaint Palm identifies Evert Fowle as the District Attorney for Kennebec County and Brad Grant, Darrick Banda, and Patricia Kelley as Assistant District Attorneys for Kennebec County.  (2d Am. Compl. ¶¶ 11-14.)

With respect to his allegation against this group of Kennebec County District Attorney's Office defendants, Palm describes how he and his mother-in-law went to the Kennebec County District Attorney's Office and asked for a copy of the police report. (2d Am. Compl. ¶ 169.)  ADA Grant told them that the Sheriff's Office had not filed a police report yet and that Grant had heard that they were not planning to file the report but that they could check back in a week or so to see if things had changed.  (Id.)  Palm and his mother-in-law tried to tell their side of the story but Grant was "indifferent and offered absolutely no solution," telling them that it was not his case and that they need to

---

[3]         Palm pleads one count entitled "Respondeat Superior" in which he charges the State of Maine with failing to manage and supervise the police department.  (Id. ¶¶ 394, 395.)  He asserts that this failure amounts to deliberate indifference of his federal and state constitutional rights.  (Id. ¶ 395.)  There is no respondent superior liability under 42 U.S.C. § 1983, Monell v. Dept. of Soc. Servs. N.Y., 436 U.S. 658 (1978), and, although there is no case law that I can find directly on point, it seems apparent that the same would hold true for claims under the Maine Constitution.  See cf. Roberts v. City of Shreveport, 397 F.3d 287, 296 (5th Cir. 2005); see also Smith v. Jackson, 463 F.Supp.2d 72, 81 (D.Me.2006) (citing Richards v. Town of Eliot, 2001 ME 132, ¶ 31, 780 A.2d 281, 29).

talk to ADA Banda who was not available.  (Id.)   When Palm asked Grant how to go about getting a copy of the police report Grant informed him that he would have to go to the Maine State Police office.  (Id.)

As the date of the hearing on Palm's wife criminal charges neared, her lawyer informed his client, Charlotte, that he was not able to get a copy of the report from the Maine State Police having been told that they were not writing a report.  (Id. ¶ 178.)  A day or so later Charlotte called the District Attorney's Office and the woman who answered the phone checked the computer and related that there had not been a report filed on Charlotte Palm or any other Palm.  (Id. ¶ 179.)  "She said she had heard about the in[]cident and it was her understanding a report was not going to be filed and thus charges would not be filed either."  (Id.)  Although she was pretty sure this was the case she advised that Charlotte could check back in a few days.  (Id.)

A few days later Palm called the District Attorney's Office and he was told by a woman that a report had been filed that day, "however according to the computer the DA's office was not pursuing the case."  (Id. ¶ 180.)  Asked by Palm what she meant, the woman said that the case was closed and there was no need for Charlotte to show up for a hearing and that, in fact, there was no date for a hearing showing in their records.  (Id.) The woman assured Palm that she was absolutely certain of this but also indicated that they could not put anything in writing.  (Id.)

Just five minutes later Palm called the District Attorney's Office again and got the same woman on the phone.  (Id. ¶ 181.)  Palm nicely asked the woman how to go about getting a copy of the police report, as Palm, his wife, and her mother had already decided to file a civil suit.  (Id.)  According to Palm:

The woman hesitated and then asked Plaintiff to hold on the line as she put Plaintiff on hold.  Within a couple of minutes ADA Grant picked up the phone and asked Plaintiff how he could help him.  Plaintiff asked Mr. Grant if he could get a copy of the police report and Mr. Grant quickly responded, "absolutely not, we don't give copies of police reports on cases that are still open."  Plaintiff was completely shocked however in a very calm and nice manner proceeded to ask Mr. Grant to please repeat his statement and then asked Mr. Grant how it was the case was now suddenly "still open" when in fact he was just told approximately five minutes earlier by a woman in Mr. Grant's office emphatically that the "case was closed".  Mr. Grant quickly snapped back "no, the case is not closed."  The Plaintiff asked Mr. Grant how it was the woman in his office had just checked the computer and assured the Plaintiff that the case was definitely closed however Mr. Grant just a few minutes later was insisting the case was open.  The Plaintiff could hardly believe his ears when Mr. Grant replied back with hesitation and most unconvincingly "we probably just had a computer glitch".  Plaintiff wasn't too sure he was going to sit down and take much more of this so he told Mr. Grant again that Plaintiff and the Plaintiff's mother had already spoken to him and the charge against the Plaintiff's wife was totally bogus and the Plaintiff insisted the charge against his wife which supposedly originated on his behalf must be dropped.  Mr. Grant of course tried to intercept this very important information and pretend he didn't hear it by instantly attacking the Plaintiff and falsely accusing the Plaintiff of being belligerent.  Plaintiff told Mr. Grant he was the one being belligerent and it was clear they were playing games and the conversation was over.  Plaintiff instantly ended the phone call with Mr. Grant.  During this same phone call with Mr. Grant, Plaintiff asked Mr. Grant what the charge against Plaintiff's wife was and Mr. Grant responded it was for "terrorizing" a "class D" misdemeanor.  Plaintiff then asked how they had gone from "criminal threatening" to "terrorizing" all of a sudden and Mr. Grant explained to Plaintiff, "oh, the police don't have a clue what they're doing when it comes to "charges" or what to put down on a summons".

(Id.)

With respect to the refusal to provide Palm with a copy of the police report, Palm

cites to a letter dated September 14, 2003, from Fowle to Charlotte Palm's attorney which

responds to a request for discovery as proof that Grant lied when he said that the policy

was not to give copies of police reports.  (Id. ¶ 337; Docket No. 33-9.)  Therein Fowle

indicates that his office "has an open file policy, so you may review our files during

normal business hours." (Docket No. 33-9 at 1.) When Palm finally received a copy of the police report he "could easily see why the Kennebec County Sheriff's Office and DA's office tried their very best to keep Plaintiff and Plaintiff's wife from getting a copy of it." (Id. ¶ 213.)

With regards to these defendants, Palm also notes that in Officer Wrigley's police report he indicated that ADA Banda was contacted from the emergency room where Charlotte Palm was being examined. (Id. ¶ 234.) "Banda," Wrigley's report represented, "advised that I was to issue Charlotte Palm a summons for Criminal Threatening and relinquish her to medical staff." (Id.) Palm stresses that it was Wrigley that contacted Banda from the emergency room. (Id.)

Apropos Palm's assertion that these defendants participated in the leveling of false charges against his wife, Palm alleges:

> Plaintiff's witness statement included an unintentional incomplete statement which Plaintiff's wife had made to him concerning their animals but at no point in it did Plaintiff ever state to anyone or write in his witness statement Plaintiff's wife ever threatened him with a gun in any way or threatened to shoot him. …. Plaintiff has repeatedly and unequivocally told the police and the DA and the ADA[]s that they were nuts if they thought they could use him to push the non-issue and in so help them cover up for their illegal and deviant and malicious action.

(Id. ¶ 85.) He insists that the Kennebec County District Attorney's Office "knowingly filed" false charges against his wife. (Id. ¶ 251.) He alleges that after Charlotte's arrest: "Plaintiff again told ADA Darrick Banda he was never 'terrorized' by his wife and Plaintiff demanded the charge against his wife must be dropped immediately. ADA Darrick Banda refused to drop the fraudulent charge." (Id. ¶ 289.) Palm and his wife "then realized the entire matter was a joke to the DA's office and they were treating it as

such. It also became apparent the case against Plaintiff's wife was not at all being handled

legally or as usual." (Id. ¶ 290.)  Palm summarizes:

> On behalf of the State of Maine, Kennebec County District
> Attorney Evert Fowle, Assistant District Attorney Darrick Banda and
> Assistant District Attorney Patricia Kelley all of the Kennebec County
> District Attorney's Office willfully and knowingly filed a false charge
> against an innocent person using the same false statements [purposefully
> made by Deputy Wrigley] with proof of the false hood not only readily
> available but also with the falsehood already known by these same
> Defendants.

(Id. ¶ 322.)  He alleges also that Fowle, Grant, Banda, and Kelley knowingly issued a

fraudulent warrant based on Wrigley's purposefully false and inaccurate statements.  ( Id.

¶ 324.) [4]

    With respect to the most serious of Palm's claims against these defendants – that

they knowingly filed a false charge against Charlotte Palm and participated in the

issuance of a false warrant, the bottom line is that Palm cannot pursue relief on a claim

under federal or state law that his wife was the subject of a false charge or a fraudulent

warrant.  Such a claim would have to be pressed by Charlotte herself.[5]

    Apropos ADA's Grant's denial of the police report to Palm and Charlotte Palm's

mother,  there is no dispute that the report in question was authored by Deputy Wrigley

and I do not see how Palm would have a legal right to have Grant share this report with

him.  If Palm had no right under federal or state law (as opposed to the Kennebec County

---

[4]     Concerning Fowle in particular, Palm's second amended complaint also alleges that Charlotte's lawyer sent a letter to Charlotte's mother stating that District Attorney Fowle had expressed his belief that Palm's grand-mal seizures (which he had been experiencing in the aftermath of the July 23, 2005, incident) "were only a sign that the Plaintiff had mental issues and he thought the Plaintiff's wife had mental issues as well and was 'mentally incompetent'."  (Id. ¶ 253.)

[5]     Although it has no bearing on my recommended disposition, Charlotte Palm has filed a separate law suit in this court with allegations stemming from the same events.  (See Palm v. Sisters of Charity Health Systems, et al., Civ. No. 07-102-B-H.)

District Attorney's Office's open door policy) to have this report provided to him by Grant than he cannot maintain a legal claim against Grant for refusing Palm's request. [6]

Finally, Palm's nineteenth and last count in his amended complaint is entitled "DISBAR" and asks the court to initiate a hearing to have Fowle, Grant, Banda, and Kelley "disbarred on the grounds of prosecutorial misconduct and/or any other grounds this Court deems appropriate."   (Id. ¶ 435.)  Palm's request that this court commence disbarment proceedings against these attorney defendants is entirely frivolous and warrants no further discussion.

### Conclusion

For the reasons set forth above I recommend that the Court grant the State Defendants' motion (Docket No. 22) and dismiss all of Palm's claims against State of Maine, the Maine State Police, Attorney General Steven Rowe, Former Chief of the Maine State Police Craig Poulin, William Snedeker, Adam Kelley, Evert Fowle, Brad Grant, Darrick Banda, and Patricia Kelley.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C.  636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

---

[6]     The other barrier to Palm's maintenance of any of the above mentioned claims against these defendants is that they are all claims that "were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force."  Imbler v. Pachtman, 424 U.S. 409, 430 (1976).  Accordingly, any 42 U.S.C. § 1983 claims against these defendants are subject to dismissal because they have asserted the affirmative defense of absolute immunity.  There is no allegation that any of these defendants made factual representations in the warrant application.  Compare Kalina v. Fletcher, 522 U.S. 118 (1997).  The same fate would befall Palm's Maine tort claims.  See 14 M.R.S. § 8111(1)(D);  Dall v. Caron, 628 A.2d 117, 119 (Me. 1993).

       Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

December 13, 2007.                              /s/ Margaret J. Kravchuk
                                                U.S. Magistrate Judge