UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JASON PALM, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 7-102-B-H |
| | ) |
| KENNEBEC COUNTY SHERIFF'S | ) |
| OFFICE, et al., | ) |
| | ) |
|     Defendants. | ) |

**RECOMMENDED DECISION**

Jason Palm originally brought a nineteen-count complaint against both state and federal actors claiming violations of state and federal law as a result of an incident that took place at the Palms' home in Kennebec County. The Kennebec County defendants, including former Sheriff Everett B. Flannery, Jr. and two patrol officers, Jeffrey Wrigley and Michael S. Durham, as well as the county itself, have moved for summary judgment on all claims. As a result of earlier motion practice, the State defendants have been dismissed from the lawsuit (Doc. No. 55, aff'd Doc. No. 60) and all official capacity claims against the county defendants have likewise been dismissed (Doc No. 52, aff'd Doc. No. 60). Jason Palm has responded to the motion with a responsive statement of material facts denying each and every allegation in the thirty-six paragraphs of defendants' statement of material facts. Palm has not provided any record citations for any of his denials. His memorandum in opposition to the motion for summary judgment does not discuss any of the legal issues raised. Instead Palm uses his responsive pleading to launch an ad hominem attack against defendants' counsel and his litigation tactics. For

purposes of my recommended decision, I have disregarded these pleadings. I now recommend that the court grant the defendants' motion for summary judgment.

## Summary Judgment Standard

"At the summary judgment stage," the United States Supreme Court explained in Scott v. Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed. Rule Civ. Proc. 56(c)). Scott reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). Palm cannot defeat summary judgment by relying on "'conclusory allegations, or rank speculation.'" Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007) (quoting Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006)).

## Undisputed Material Facts[1]

The following facts are material to the summary judgment motion. They are drawn from the parties' statements of material facts in accordance with District of Maine Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

On July 23, 2005, Michael Durham and Jeffrey Wrigley were Kennebec County deputy sheriffs and Everett Flannery was the Kennebec County Sheriff. On that date Wrigley and Durham were separately contacted by their dispatch and told that there was a distraught woman with a weapon and rescue felt that they were in danger. Dispatch requested an immediate response at the scene. Dispatch further related that the husband, Jason Palm, had given a handgun to the fire chief and had warned the fire chief that he might need the gun to protect himself because his wife had a similar weapon in the home and was distraught. Wrigley and Durham responded to the scene. On the way to the scene, dispatch relayed information to the officers that Jason Palm's mother-in-law was being transported to the hospital by ambulance and Jason Palm was following the ambulance in a vehicle. Dispatch also advised that they had attempted to make phone contact with Charlotte Palm, but had been unable to make contact.

---

[1] I recognize that pro se litigants must be accorded a measure of liberality when interpreting their pleadings. See Clarke v. Blais, 473 F. Supp. 2d 124, 128 (D. Me. 2007) (incorporating pro se litigant's affidavit testimony despite non-compliance with Local Rule 56). However, in the present case Jason Palm completely fails to set forth facts that can be woven into the existing summary judgment record in any sort of coherent fashion. These undisputed facts are therefore taken verbatim from the defendants' submission as they are appropriately supported by record citations. I realize that Jason Palm denies all of these facts, including that Durham and Wrigley were Kennebec County deputy sheriffs and that Everett Flannery was the Kennebec County Sheriff on July 23, 2005. (See Resp. SMF ¶ 1.) Without record support his submission is simply of no aid to the court.

On the way to the scene, Durham stopped Jason Palm on Route 17 in order to ascertain further information. Durham had his lights flashing and asked Jason Palm to get out of the car. Durham did not have his weapon drawn. Jason Palm was scared and cooperative. He provided Durham with information about the layout of the house and confirmed that Charlotte Palm was armed and had threatened to kill herself. This stop lasted less than fifteen minutes.

Upon arrival at the scene Wrigley stopped on a road just out of sight of the Palms' residence. He spoke with fire and rescue personnel in order to ascertain details about the situation. He was told by the Fayette Fire Chief that Jason Palm had handed him a handgun and told him to keep it for protection because his wife was distraught and had a weapon. A perimeter in the wood line around the Palm residence was set up by Wrigley and other law enforcement officers who were present. Durham manned the perimeter until he was relieved by the Maine State Police at which time he went to the road with two Fayette firefighters to prevent anyone else from coming down the road into the perimeter.

After the perimeter was established, Wrigley contacted Jason Palm to gather additional information. Jason Palm told Wrigley that he had been married to Charlotte for approximately seven years and they recently were fighting over financial matters. Jason Palm stated that the prior day Charlotte had told him she wanted a divorce and today she had gotten mad and told him to leave immediately. Jason Palm stated that he was concerned for the safety of his wife and himself so he decided to recover his two handguns and a rifle that he owns because he did not trust Charlotte with firearms. Jason was only able to recover one of the firearms, a 9 mm handgun, which he turned over to

4

the Fayette Fire Chief.  Jason Palm stated that Charlotte was definitely capable of shooting someone and she was armed with a 9 mm handgun.  He stated that Charlotte had been carrying the handgun on her person for the last few days.  Jason Palm warned Wrigley that he and Charlotte had had conversations that if the government ever tried to seize their home they would burn it with themselves inside.  Jason stated that Charlotte would definitely harm a police officer.  He said that Charlotte had been stressed out and dealing with intense anxiety and had decided she wanted to die.  Jason stated that Charlotte had recently been talking about starving herself to death.  After Wrigley spoke to Jason Palm, he contacted the Maine State Police tactical team for assistance in maintaining the perimeter and negotiating with Charlotte Palm.

  Once the Maine State Police tactical team arrived on the scene they took control of the scene. As members of the tactical team arrived they relieved Kennebec County officers who were on the perimeter. Wrigley contacted Jason Palm on the phone a second time.  That time Jason stated that he was in fear of his life and he stated that he could not walk back in the home because Charlotte would shoot him immediately.  Jason also explained that Charlotte believes he is Jesus Christ and that she had written approximately 1,000 e-mails to several federal agencies based on a conspiracy theory that she has on 9/11 attacks and President Bush and Clinton.  The conversation ended when Jason stated "the only way you are going to get her out of there without guns blazing, is to have George Bush in person."

  After this conversation, Wrigley contacted an Assistant District Attorney and was advised that he should apply for an arrest warrant.  Wrigley drafted an Affidavit and Request for Arrest Warrant for Charlotte Palm for criminal threatening, a violation under

5

17-A M.R.S.A. § 209, which was reviewed by an Assistant District Attorney. Wrigley took the Affidavit and Request for Arrest Warrant to the home of Justice Studstrup where it was reviewed and signed. Wrigley returned to the residence and informed the Maine State Police that he had obtained the Arrest Warrant.

Shortly after Wrigley returned to the residence he was informed that Jason Palm was waiting at the end of the road. Wrigley sent statement forms out to Palm and asked that he complete a statement. In his statement, Jason Palm stated "I fear for her life [and] the lives of anyone getting in her way from getting answers. . . . This is why I asked for help . . . . Getting answers is one thing but, getting them, being this pissed at the world not being in the right frame of mind [and] having a loaded hand gun really scares me."

While Charlotte Palm was inside the residence, a team of negotiators from the Maine State tactical team attempted to negotiate with Charlotte for several hours, but she refused to come out. At one point, gunfire was heard coming from the residence. Durham heard at least two bullets go over his head. The Maine State Police shot tear gas into the residence, but Charlotte did not come out of the home. The Maine State Police shot another round of tear gas into the home at which point Charlotte did exit the home. Charlotte was immediately taken into custody by the Maine State Police. After Charlotte was in custody, Wrigley transported her to Maine General Hospital in Augusta.

During this incident Wrigley and Durham were concerned about Charlotte's safety, the safety of rescue personnel and law enforcement, and the safety of the public if Charlotte left the residence. As this incident unfolded, Wrigley and Durham believed that this was a barricade situation and that Charlotte was mentally unstable and needed to be evaluated. None of the Kennebec County Sheriff's officers, including Wrigley and

Durham, were involved in negotiating with Charlotte or launching tear gas into the residence.  None of the Kennebec County Sheriff's officers caused any physical damage to the Palms' residence.  Sheriff Flannery was not present at the scene of this incident.

## Discussion

The second amended complaint in this action consists of nineteen counts and is close to 150 pages long.  It is difficult to ascertain which defendants are being sued in which counts.  The complaint also contains a great deal of factual material that is irrelevant to the claims by Jason Palm against any of these four remaining defendants.  In order to deal with the claims in a rational fashion I have followed the approach taken by the defendants and addressed the state law tort claims first and then turned to the federal claims.  However, before I take up those claims as to Durham and Wrigley, I will first address the claims against Everett Flannery and Kennebec County.  It is undisputed on this summary judgment record that Sheriff Flannery was not at the scene of this incident. Even Palm's original amended complaint does not clearly set forth any factual basis for the Sheriff's potential liability.  Nor does this complaint set forth a factual or a legal basis for Kennebec County's potential liability.  See Grieveson v. Anderson, __ F.3d __, __, 2008 WL 3823872, 5 -8 (7th Cir. Aug. 18, 2008).  These two defendants are clearly entitled to summary judgment.

**State Tort Claims as to Wrigley and Durham**

Palm seeks to hold Wrigley and Durham liable for a wide variety of torts including fraud, invasion of privacy, intentional infliction of emotional distress, abuse of process, and negligence.  Palm cannot prevail on these claims because under Maine law

Wrigley and Durham have absolute discretionary immunity.   The Maine Tort Claims Act, 14 M.R.S.A. § 8111(1)(C), provides, in pertinent part:

> Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following: . . . performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid; . . .

14 M.R.S. § 8111(1)(C):

> The absolute immunity provided by paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized by statute, charter, ordinance, order, resolution, rule or resolve and shall be available to all governmental employees, including police officers . . . who are required to exercise judgment or discretion in performing their official duties.

Id. § 8111(1)(emphasis added).

It is abundantly clear to me that Wrigley and Durham were acting as authorized law enforcement officers when they interacted with Jason Palm. By statute they are authorized to enforce criminal laws, to investigate violations of criminal laws, and to protect citizens from harm. See 30-A M.R.S.§ 451, et. seq.   In accordance with their statutory mandate, Wrigley and Durham made decisions and followed a course of action in furtherance of those statutory objectives. Of course each officer exercised his own discretion as to how he could best fulfill his obligations, given the situation that was unfurling before him. Their conduct on July 23, 2005, is entitled to the absolute immunity afforded by the tort claims act. That immunity embraces not only negligent acts, but also intentional acts taken within the course and scope of their employment, as long as the actions were not taken in bad faith. 14 M.R.S. § 8111(1)(E). There is no factual evidence to support a finding that either Wrigley or Durham acted in bad faith.

**Constitutional Claims as to Wrigley and Durham**

Palm's complaint includes four counts which allege violations of constitutional rights. These include Count One in which Palm alleges that defendants violated his civil rights; Count Nine in which he alleges supervisory liability; and Count Thirteen in which he alleges a conspiracy to violate his civil rights. Count Fourteen includes a claim based on the Maine Civil Rights Act which is analyzed co-extensively with the federal constitutional claims. See Dimmitt v. Ockenfels, 220 F.R.D. 116, 123 (D. Me. 2004) ("A conclusion that the defendants are not liable under 42 U.S.C. § 1983 also disposes of the plaintiff's claims under 5 M.R.S.A. § 4682, the Maine Human Rights Act."). A review of the complaint suggests that the facts giving rise to these claims vis-à-vis these defendants are the search and seizure of Jason Palm in violation of the Fourth Amendment by Durham and the seizure of the home by Durham and Wrigley. The supervisory liability would have been directed at Flannery, but there are no facts supportive of that claim and it actually appears that the claims against Flannery and Kennebec County were grounded in a theory of respondeat superior liability. As I indicated above there are simply no facts that support any custom or practice that would generate municipal liability or any direct involvement by the Sheriff that would generate supervisory liability. Nor, as discussed below, is there any constitutional violation by any of the Sheriff's deputies, a necessary prerequisite for supervisory liability. See Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988).

Durham does appear to be implicated in the temporary traffic stop where Jason Palm was "seized." An involuntary traffic stop does amount to a seizure under the Fourth Amendment and the constitutionality of the seizure depends on the individual

circumstances of the stop. See Illinois v. Lidster, 540 U.S. 419, 425-426 (2004). The important thing to remember about the Fourth Amendment in this context is that the touchstone is "reasonableness," because the Constitution only provides protection from unreasonable searches and seizures. In this case, Durham stopped Palm in order to gather additional information about the circumstances surrounding the situation concerning his wife. He was also asked about the layout of the home. Durham certainly did not make a random traffic stop. His stop was investigatory in nature because he was confronting an evolving dangerous situation. Under any normal understanding of reasonable behavior, Durham's actions when stopping Jason Palm's vehicle pass muster. There was no constitutional violation.

Palm's constitutional claim under the Fourth Amendment may also relate to the "perimeter" the officers created around the home. The officers had a warrant to arrest Charlotte Palm and, therefore, had a right to enter the home where she was known to be. See Steagald v. United States, 451 U.S. 204, 213 (1981). Securing the perimeter was a precautionary predicate to this necessary arrest given the facts in this record pertaining to Charlotte Palm's state of mind. Phillips v. James, 422 F.3d 1075, 1082 -83 (10th Cir. 2005) ("In this case, the SWAT team was not requested to execute an arrest of Mr. Phillips or to search his residence; the SWAT team in this instance was called in as back up and performed the more passive role of securing the perimeter. … In this case, while attempting to "assess the situation," Officer Dibble learned from Mrs. Phillips that her husband was barricaded in a room filled with weapons and that he had threatened to hurt himself. … Armed with this information, coupled with the violent threats made by Mr. Phillips and his clearly unstable condition, Chief James was not unreasonable in

requesting the passive assistance of the SWAT team.").[2] I could find no cases that stood for the proposition that the setting up of a perimeter standing alone implicated the Fourth Amendment right of an individual who had a property interest in the property but who was not at the time in the premises. Compare Estate of Smith v. Marasco, 318 F.3d 497, 515 -518 (3d Cir. 2003).  Accordingly, even if the officers' conduct amounted to a seizure of the residence for Fourth Amendment purposes, there is no case law that would suggest such conduct is unreasonable in this factual context and even if it could be deemed unreasonable, the officers would be entitled to qualified immunity. See, e.g., Wilson v. Layne, 526 U.S. 603 (1999).  The same end would meet this claim if it were framed as one arising under Soldal v. Cook County, 506 U.S. 56, 68-69 (1992); these officers are only implicated in setting up the perimeter.  See Downeast Ventures, Ltd. v. Washington County, Civ. No. 05-87-B-W, 2007 WL 1745630, 10 -12 (D. Me. June 13, 2007) (recommended decision), aff'd 2007 WL 2386318 (D.Me. Aug 17, 2007).  As far as the timing of any actual entry into home, that decision appeared to have been made by the Maine State Police Tactical Team and based on the summary judgment record it is not established that Wrigley or Durham played any role at all in that decision.

## Conclusion

Based upon the foregoing I recommend that the court grant the defendants' motion for summary judgment and enter judgment for the county defendants on all remaining counts and claims.

---

[2] Indeed, from my research the question of securing the perimeters in cases with Fourth Amendment claims stemming from this type of law enforcement response involve facts material to the question of whether or not the responding officers took sufficient safety precautions - such as securing the perimeters - prior to confronting the individual sought. See, e.g., Phillips v. James, 422 F.3d 1075, 1078 -79 & n.1 (10th Cir. 2005); Alexander v. City and County of San Francisco, 29 F.3d 1355, 1365 n. 11 (9th Cir. 1994).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed without ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

            /s/ Margaret J. Kravchuk
            U.S. Magistrate Judge

August 21, 2008